DECISION.
{¶ 1} Following a bench trial, appellant Darshoned Roper was convicted of burglary and receiving stolen property. The trial court sentenced him to terms of three years for burglary and one year for receiving stolen property, to be served concurrently. In this appeal, Roper now raises two assignments of error. He claims that he was denied the effective assistance of trial counsel because his attorney failed to move to suppress his pretrial identification, and that his burglary conviction was against the weight of the evidence. We overrule the first assignment. We sustain the second assignment as to the burglary conviction only and order a new trial on that charge.
I. The Break-In
{¶ 2} At approximately 8:30 a.m. on February 4, 2002, Jeremiah Kraus was sitting in his car, eating breakfast and waiting for his class to start at the University of Cincinnati. He noticed a man, later identified as Vernon Williams, use a broom handle to prop open the door of an apartment building. The building was approximately 20 yards from Kraus's car. Two or three minutes later, a Buick Regal pulled up on the opposite side of the street from where Kraus was parked, approximately 30 yards away. Williams removed boxes containing wheel rims from the apartment building and handed them to the driver of the Regal, who then placed the boxes in the car. Kraus observed the men, unobstructed, for approximately five minutes. He then left for class. He testified that the incident did not, at the time, particularly concern him.
{¶ 3} When Kraus returned to his car a few hours later, Cincinnati Police Specialist Dennis Ficker asked if he had seen anything earlier that morning. He told the officer that he had seen two men loading boxes into a Buick Regal.
II. The Photo Array
{¶ 4} Kraus met with Detective Ficker and was shown six photographs of African-American men. Ficker told him to look through the photographs and to "see if anything caught [his] eyes." Kraus pointed to the photograph of Roper and told Ficker that he thought that the photograph depicted the man who had driven the Regal, and that it was "closest" to the man he had seen. He said that he remembered that the driver had gold front teeth and that the teeth were "probably the strongest thing" he had seen. When Ficker showed him photographs of Roper's Buick Regal, Kraus said that they "definitely" depicted the car he had observed. Kraus later testified that he had no doubt about the car.
III. A Non-Identification
{¶ 5} At trial, when Kraus was asked if he saw in the courtroom the man he had seen driving the Regal, he testified, "Possibly." On cross-examination, he testified that he could not "say before God" that he was "absolutely sure" that he could identify the person whom he had observed, and that he could not swear that Roper was the person who had committed the burglary. He also testified that he could not identify with certainty the person who had carried out the boxes.
IV. Other Testimony
{¶ 6} The victim of the burglary was Derrick Bryant, a bank employee and a college student. He testified that he had allowed his friend Williams to spend the early morning hours in his home the day of the burglary because Williams had no place to stay. At approximately 8:05 that morning, he and Williams had left the apartment. Bryant locked his apartment door when he left.
{¶ 7} While Bryant was attending a class at the University of Cincinnati, a neighbor contacted him and told him that his apartment had been "messed up" and that its door was "wide open." Bryant returned home to discover that his car window had been broken and that a television set, a gun, and ammunition had been taken, and that the car's console had been "ripped out." He determined that a bookbag, a cell phone, two sweaters, a pair of pants, a pair of shoes, jewelry valued at $10,000, 20-inch wheel rims valued at $1,650, a Playstation 2, and some CDs, DVD movies, video games, and car equipment were missing from his apartment.
{¶ 8} Bryant testified that he had not given permission for Roper to enter his apartment or to possess the wheel rims. Bryant also identified the Buick Regal as belonging to Roper.
{¶ 9} Chavonne Dale, Roper's ex-girlfriend who was pregnant with his child at the time of the trial, stated that she had lived with Roper for a month. She also testified that she knew Bryant and that she had dated him once. Dale stated that Roper drove a black Buick Regal with a roof the color of peanut butter, and she identified a photograph that depicted Roper's car.
{¶ 10} Dale had spent the night before the burglary with Roper. The next morning, she left Roper's building and arrived at the University of Cincinnati, where she was a student, at 7:15 a.m. Upon parking her car, she saw Williams coming down Euclid Avenue. She attended classes and returned to Roper's apartment a little after 10:00 a.m. She was then driving another car owned by Roper. Roper called her about ten minutes later and told her to let Williams into the apartment. Believing that Roper was angry with Williams, she asked why she should allow him into the apartment. Roper told her, "[H]e did something to make up for it." Williams arrived dressed in Bryant's clothing and wearing jewelry that she did not recognize. Ten minutes later, Roper called again and asked that she and Williams meet him downstairs.
{¶ 11} Roper arrived about 10:30 a.m. in his Regal. He handed Dale a box to carry upstairs. She opened it and found DVDs inside. She refused to carry anything else because she believed that the objects had been stolen. She saw televisions, a Playstation 2, DVD games, a C.D. player, a VCR player from a car, a gun, some Timberland boots, and a box containing wheel rims. She recognized the TVs and boots as belonging to Bryant.
{¶ 12} She observed Roper and someone else wiping the stolen articles with alcohol and placing them in a bag. Roper told her later that he had sent Williams to Akron.
{¶ 13} Dale testified that, later that evening, Taurean Spratt came to Roper's apartment and took the wheel rims. Spratt testified that Roper had called him and told him that he had some "20-inch rims" for sale. Spratt gave Roper $150 for the wheel rims and agreed to pay him more later. Spratt did not know they were stolen when he purchased them. Spratt testified that only he and Roper were present at the time he made the purchase. He did not see Dale, but stated that she could have been in the bedroom.
{¶ 14} Ficker testified that when he was investigating the burglary, he noticed Kraus returning to his car. Because the car was parked right in front of the apartment building, he asked Kraus if he had seen anything. Kraus gave a distinct description of the automobile, and Bryant recognized it as belonging to a friend of Williams. Ficker and Bryant went to where they thought the car owner lived to see if the Buick Regal was there. When it had not appeared for some time, Ficker went to the residence to discover where the Regal was. The person who answered the door was Roper's mother. The next day Roper called Ficker and they agreed to meet. Ficker took some photographs of the Regal and one photograph of Roper. Roper admitted that the Regal belonged to him.
{¶ 15} The following day, Ficker showed Kraus two photographic arrays. One contained a photograph of Williams and the other contained a photograph of Roper. Kraus could not identify Williams. According to Ficker, Kraus identified Roper's photograph as depicting the driver of the Regal and said that he remembered the driver as having gold teeth. Ficker testified that Roper did have gold teeth on the day that he had spoken to him. Ficker identified Roper in court.
{¶ 16} The officer also testified about telephone calls made between Roper's cellular phone and Bryant's stolen cellular phone. (Bryant put the cellular phone in Williams's name because William needed to get a credit rating. Bryant paid the bill to make Williams's credit look good. The account belonged to Williams on paper, but the phone actually belonged to Bryant.) A call was made from Bryant's cellular phone to Roper at 8:26 a.m. Another call was made at 8:32 a.m. At 9:12 a.m. and 9:18 a.m., Roper called his own apartment. Roper called his home from his cellular phone. There were also calls made from Roper's phone to Ficker that matched the times that Roper left messages on Ficker's answering machine. This evidence contradicted Roper's comments to Ficker that he and Williams had not been speaking to each other because of a disagreement. There were also calls on Roper's phone to Spratt during the pertinent time.
{¶ 17} Stephen Howard, Roper's employer at a cleaning service, testified that Roper was at work on February 4, 2002, at 8:45 a.m., and that he had left at 9:10 a.m. in a company van to clean a building. Howard testified that Roper would have had to be at the building to be cleaned by 9:30 that morning. He stated that he did not bring any documentation of Roper's signing in for work because he had not known that it was required.
{¶ 18} Chris Wimpye, a friend of Roper's, testified that he had spent the night at Roper's house on February 3, and that Roper had awakened him between 8:15 and 8:25 a.m. the next morning to drive him to work. Wimpye had not seen Dale in the apartment while he was there. He drove Roper to work in Roper's Plymouth Acclaim and dropped him off at approximately 8:50 a.m. Ficker testified that Wimpye had told him that he had driven Roper to work in Wimpye's sister's car. Wimpye also testified that the Regal was not driven because it was inoperable.
V. Ineffective Assistance Moot
{¶ 19} In his first assignment, Roper contends that he was not afforded effective assistance because his trial counsel failed to move to suppress his pretrial identification. This identification was what led to his burglary conviction. Although the photographic array depicting only Roper with gold teeth, where the witness identified the gold teeth of the suspect as the only distinguishing feature, was unduly suggestive, we need not address whether Roper was denied effective assistance. This is because we sustain Roper's challenge to the weight of the evidence supporting his conviction of burglary.
VI. Burglary Conviction Against Weight of Evidence
{¶ 20} In his second assignment, Roper challenges the weight of the evidence supporting his conviction for burglary. This assignment is based on Kraus's inability to testify that he was certain that Roper was the man whom he had seen committing the burglary. Roper argues that this equivocal identification was outweighed by his employer's testimony that he had been at work by 8:45 a.m. and by Wimpye's testimony that he had driven Roper to work in Roper's Plymouth Acclaim at approximately 8:50 a.m. Howard, his employer, failed to bring in documentation of Roper's signing in that morning.
{¶ 21} In addressing a challenge to the weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[1] If a manifest miscarriage of justice has occurred, the defendant is entitled to a new trial.[2] Under the facts of this case, where Roper's employer testified unequivocally that Roper was at work during the time of the burglary and the tentative in-court identification of Roper was the only evidence offered against Roper on the burglary charge, we conclude that Roper's conviction was against the manifest weight of the evidence. Even without the employer's testimony, the identification of Roper as the burglar was so weak that it could not reliably support a conviction on the burglary charge. We sustain Roper's second assignment.
VII. One Conviction Affirmed, One Reversed
{¶ 22} We affirm Roper's conviction for receiving stolen property. Because we have determined that Roper's conviction for burglary was against the manifest weight of the evidence, we reverse the trial court's judgment as to that offense and remand for a new trial.
Judgment affirmed in part and reversed in part, and cause remanded.
Doan, P.J., and Winkler, J., concur.
[1] See State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[2] Id.